UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X **Docket#**
UNITED STATES OF AMERICA,      : 16-cr-00474-FB
                               :
       - versus -              : U.S. Courthouse
                               : Brooklyn, New York
JOHN DOE,                      :
               Defendant       : February 22, 2021
------------------------------X

TRANSCRIPT OF CRIMINAL CAUSE FOR
VIOLATION OF SUPERVISED RELEASE
BEFORE THE HONORABLE ROBERT M. LEVY
UNITED STATES MAGISTRATE JUDGE

**A  P  P  E  A  R  A  N  C  E  S:**
(VIA TELEPHONE AND VIDEO)


**For the Government:**          **Seth D. DuCharme, Esq.**
                                Acting U.S. Attorney

                         BY:    **Lindsay Gerdes, Esq.**
                                Assistant U.S. Attorney
                                271 Cadman Plaza East
                                Brooklyn, New York  11201


**For the Defendant:**           **Nancy Lee Ennis, Esq.**
                                40 Fulton Street
                                23rd Floor
                                New York, New York 10038


**Transcription Service:**       **Transcriptions Plus II, Inc.**
                                61 Beatrice Avenue
                                West Islip, NY 11795
                                Laferrara44@gmail.com



Proceedings recorded by electronic sound-recording,
transcript produced by transcription service

2

Proceedings

1          THE CLERK:  This is a Criminal Cause for

2   Violation of supervised release, United States of America

3   v. Gene Borello, case number 16-cr-474.

4          Can I have the parties state their name for the

5   record, for the government please?

6          MS. GERDES:  Good afternoon, your Honor.

7          Lindsay Gerdes for the United States and I'm

8   joined by Probation Officer Mike Imrek.

9          THE COURT:  Good afternoon.

10         MS. ENNIS:  And it's Nancy Ennis for Mr.

11  Borello and Mr. Borrello is also present listening in.

12         Good afternoon, your Honor.

13         THE COURT:  Good afternoon, your Honor.  Good

14  afternoon, Mr. Borrello.

15         THE DEFENDANT:  Good afternoon, Judge.

16         THE COURT:  All right.  So do you understand

17  that because of the pandemic, it's not safe for all of us

18  to be in the same room together or in a courthouse.

19         THE DEFENDANT:  Yes, I understand.

20         THE COURT:  And so as a result, you and I and

21  the prosecutor and court personnel are appearing by video

22  and your lawyer unfortunately is appearing only by audio

23  but not by video.

24         THE DEFENDANT:  Yes.

25         THE COURT:  Do you have a problem with that or

3

Proceedings

1   were you --

2              THE DEFENDANT:  No, I'm okay with that.

3              THE COURT:  And so I'm making a finding under

4   the CARES Act that it would be both in the interest of

5   justice and I believe in you interest, to go ahead with

6   the arraignment today and the bail application.

7              THE DEFENDANT:  Yes.

8              THE COURT:  Have you discussed this with your

9   lawyer?

10             THE DEFENDANT:  Yes.

11             THE COURT:  All right.  So I am just going to

12  ask defense counsel, do you on behalf of your client

13  consent to proceed as we've just described?

14             MS. ENNIS:  Yes, your Honor.

15             THE COURT:  Okay.  And are you satisfied that

16  Mr. Borrello's consent is knowing and voluntary?

17             MS. ENNIS:  Yes.

18             THE COURT:  All right.  So do you understand,

19  Mr. Borrello that you're here because the probation

20  department has filed a violation of supervised release

21  petition?

22             THE DEFENDANT:  Yes.

23             THE COURT:  And that (audio interference) a

24  number a allegations in that petition.

25             THE DEFENDANT:  Yes, I do.

4

Proceedings

1          THE COURT:  Have you had a chance to talk to
2    your lawyer about the charges and --
3          THE DEFENDANT:  Yes.
4          THE COURT:  -- (audio interference) explained
5    them to you?
6          THE DEFENDANT:  Yes.
7          THE COURT:  Do you understand them all?
8          THE DEFENDANT:  Yes, I do.
9          THE COURT:  All right.  And counsel, are you
10   satisfied that your client understands the charges
11   against him?
12         MS. ENNIS:  Yes.
13         THE COURT:  And how does he plead?
14         MS. ENNIS:  He pleads not guilty.
15         THE COURT:  Okay.  So who would like to go
16   first here?  What's the government's position on bail at
17   this point?
18         MS. GERDES:  Judge, I spoke to Ms. Ennis and we
19   are asking for a detention here and given that the burden
20   is on the defense on a VOSR, we would ask that she
21   present any package she would have first and then I can
22   respond.
23         THE COURT:  Okay.  Ms. Ennis?
24         MS. ENNIS:  Yes, I'm ready to proceed.  We
25   proposed that he be released to live at his mother's

5

Proceedings

1    home.  The government is very aware of that address, as

2    is the probation department.  And I believe his mother

3    was going to try to phone in.  I don't know if she has

4    successfully been able to do yet but I've been in regular

5    consultation with her since early this morning.  So

6    that's fine with her.

7           The condition that I'm suggesting is that he be

8    placed on electronic monitoring and that that be pretty

9    much around the clock and that he just be permitted to

10   leave when he has specific approval to leave, for

11   example, for a doctor's appointment that's been pre-

12   approved.

13          So he would be detained on home detention for

14   the duration while we try to figure out this matter and

15   if necessary, they'd be willing to post some kind of cash

16   bail, although they don't have a lot of money to offer.

17   I would suggest something in the neighborhood between 5

18   and $10,000 and that is essentially what we're proposing,

19   the principal issue being home detention where he would

20   remain for the duration of this case while we're sorting

21   it out.

22          THE COURT:  All right.  What is the

23   government's position?

24          MS. GERDES:  Thank you, your Honor.  As I said,

25   we're here on a VOSR, so the burden is on the defense to

6

Proceedings

1    prove by clear and convincing evidence that the defendant

2    is not a flight risk or a danger to the community.

3            I'm sure the Court has had a chance to review

4    the VOSR report.  The offenses of conviction here are

5    extremely violent.  The defendant engaged in a pattern of

6    conduct that's a part of his association with the Bonanno

7    Crime Family.  He also committed lots of crimes on his

8    own.  He's been involved in multiple shootings, home

9    invasions where people were tied up, brazen, broad-day

10   burglaries of businesses, arsons, beatings.  He also has

11   a criminal history that pre-dates his federal case

12   involving multiple gun convictions.

13           Mr. Borrello was given an extremely generous

14   sentence of time served by Judge Block in large part due

15   to his cooperation with the government (audio

16   interference) discussed, so that's why I am discussing it

17   here.

18           And the sentence of time served was basically -

19   - it (audio interference) that could've put him in jail

20   for the rest of his life.  While he was (audio

21   interference) under a microscope, court-ordered

22   supervision, he has (audio interference) say the most

23   egregious breach of trust coming in the form of him

24   committing what amounts to a new federal crime, depending

25   on which statute it's charged under.  It could be

7

Proceedings

1  punished by anywhere from up to five to 20 years in jail.

2          And these threats that he made are just very,

3  very serious, threatening to basically kill the husband

4  of his ex-girlfriend and to brutally beat her father all

5  because she refused to grant him permission to publish a

6  picture of her in a book that he's working on.

7          Some of the messages are outlined in the VOSR

8  report to the Court.  They're very, very serious threats

9  and from our perspective, you know, we have to take this

10  very seriously and we are.  After he made these threats,

11  he showed up unannounced to the home of his ex-

12  girlfriend's mother and approached a vehicle there and

13  only left after he realized that his ex-girlfriend wasn't

14  in the car and when her mother confronted him about this,

15  he initially lied and said he was never there.  It was

16  only after she said that she had him on video that he

17  actually admitted to being there.

18          He's also charged with violating the terms of

19  his supervised release for multiple association

20  violations with convicted felons and associates of

21  organized crimes, for hosting this podcast that effective

22  glorifies crime and that type of activity committed by

23  members of La Cosa Nostra and it appears as though the

24  next best thing for him to committing crimes was being on

25  air talking about them and I'm not going to sit here and

8

Proceedings

1  suggest that the association charges make him a danger to

2  the community but they rather show his disrespect and

3  contempt for the rules of the Court, the probation

4  department and things that the government has discussed

5  with him.  It's as though he thinks he's above the law.

6          He's not reporting any of his income from these

7  podcasts to probation, yet he's posting videos of himself

8  on social media, holding thousands of dollars, wearing

9  expensive Rolex watches, driving around in a high-end

10 Porsche, wearing thousands of dollars in designer

11 apparel.

12          But I think my arguments for detention all stem

13 from the danger that he poses to the community.  When

14 somebody like him with a criminal history that includes

15 shooting people and shooting at people, threatens to hurt

16 or kill another individual, it's something that we as law

17 enforcement agents take very seriously.

18          And he's also somebody who based on his past,

19 has shown that he has inability to control his temper and

20 his emotions and he acts on impulse, without really any

21 regard for how it affects other people and that's what

22 makes him so dangerous when he's set off.

23          And you know, the concern with just being on

24 home confinement is that he committed the instant

25 underlying offense, presumably from his house, using a

9

Proceedings

1   telephone, threatening people, essentially extorting

2   them, making these comments when he just didn't get

3   something that he wanted and I don't think that there's

4   any kind of documented history -- you know, we've been

5   dealing with him for over five years, any documented

6   history I'm aware of that suggests that he's particularly

7   susceptible to COVID, he faces up to five years on these

8   violations alone, ignoring any new federal charges and

9   his guidelines range is 51 to 63 months.

10          So for all those reasons, the government

11  believes that the bail package set forth by the defense

12  is insufficient.  They do not meet their burden here and

13  we would ask that your Honor detain Mr. Borrello.

14          THE COURT:  Ms. Ennis?

15          MS. ENNIS:  Yes, your Honor, may I be heard?

16          THE COURT:  Yes.

17          MS. ENNIS:  Yes.  Clearly we're not in a

18  position to litigate the entire, you know, entity of

19  these charges today in front of the Court but I would

20  like to respond in several respects.

21          First of all, I believe the government will

22  concede that there's no indication that Mr. Borrello is a

23  flight risk because we have had a number of meetings in

24  person and also by email and messaging and over the phone

25  about these issues for almost a year now.

10

Proceedings

1          They've been raised, they've been argued,
2    they've been repeated and with respect to the most
3    inflammatory charge, that is that he threatened his ex,
4    his ex-girlfriend of many years, we had a meeting in
5    person about that on February 9th where all the agents
6    were there, where AUSA Gerdes was there, where two people
7    from probation were there.  We suggested anger management
8    might be an appropriate course of action for Mr. Borrello
9    but we also discussed in full that he had subsequently
10   apologized to his ex-girlfriend about any sort of falling
11   out they had, and in fact that she had then gone to
12   Gangland News, which the Court may or may not be aware
13   of, which is published by Jerry Capeci and she had gone
14   to Gangland News and said that she's not afraid of Mr.
15   Borrello and she was kind of dismissive of these charges
16   and that's been published.
17          And so while inflammatory, these charges are
18   not new and her involvement in this matter is not new
19   either.  While Mr. Borrello was cooperating with the
20   government for a period of years, she was also brought
21   into help cooperate and did -- participated in
22   discussions of some third-party cooperation and so she's
23   -- it's complicated, it's not as uncomplicated as the
24   government is trying to present here.
25          Next, I would like to say that really nothing

11

Proceedings

1  has happened since February 9th, since our meetings on

2  February 9th which were where we parted ways on

3  relatively good terms at the end of that meeting.

4  Nothing has happened to instigate this particular arrest.

5  There certainly has been no repeated incident.

6          I am concerned, your Honor, about the

7  government's request for incarceration.  As the

8  government's well aware, Mr. Borrello was pivotal in the

9  conviction of 21 that I know of so far, 21 members of the

10  Bonanno Crime Family and related La Cosa Nostra

11  individuals who are in custody now within the federal

12  penal system.  I believe most of them are still in

13  custody.

14          And therefore, the government has failed to

15  mention the extreme exposure that he would face if he

16  were reincarcerated, a headache for the BOP, no doubt,

17  you know, so a true danger to him and again, I think

18  there's no indication that the government thinks he's a

19  flight risk, since not this January but since January of

20  2020, we have been debating these issues because the

21  government started out by just wanting Mr. Borrello to

22  cease his podcast about -- that he does about life in the

23  mob which he is focused upon trying to discourage from

24  romanticizing the mob and from thinking it's a great

25  thing.  And we've been debating that but he has a First

12

Proceedings

1  Amendment right or he has some First Amendment rights

2  that are not quashed by being on supervised release.

3          As I think the recent case in the Southern

4  District of New York showed, Judge Hellerstein said that

5  probation in the Southern District could not send Michael

6  Cohen, the lawyer for Donald Trump back to prison because

7  he was writing a book about his past, about -- even

8  though the probation department wanted him to remain

9  silent and Attorney General Barr wanted him to remain

10  silent.  Judge Hellerstein ordered that he be released.

11          And so we have an element of the First

12  Amendment issue here, your Honor because it's really

13  these podcasts that he's been doing about his

14  reminiscences of his youth in the mob that have been

15  annoying the government and I think it's debatable

16  whether they should be annoying to the government.

17          But in any event, these are all issues that we

18  cannot resolve here today but I think they are germane to

19  the question of whether they should be released and I

20  would ask your Honor to ask us any questions, if there's

21  anything we have not made clear.

22          MS. GERDES:  Judge, can I just (audio

23  interference)?

24          THE COURT:  I'm sorry, go ahead.

25          MS. GERDES:  May I briefly respond, your Honor?

13

Proceedings

1          THE COURT:  Yes, please.

2          MS. GERDES:  Okay, thank you.  Just a couple of

3   points.  First, the situation is non-analogous to the

4   Michael Cohen situation.  There is a strict (audio

5   interference) on the defendant that he not associate

6   (audio interference) short of having court-ordered

7   supervision and that is just a term of his supervision

8   that he is completely disregarded.

9          Second, to the extent that the defendant (audio

10  interference) risk-harm to the defendant as a reason that

11  the Court should not detain him, defendant himself has

12  chosen to live in the Howard Beach community since --

13  almost since his release from jail, putting himself from,

14  you know, living in the same area where the families of

15  the people he cooperated against live.  So he obviously

16  didn't feel threatened or concerned about living in that

17  area and the government is prepared to take measures

18  (indiscernible) to ensure his continued safety.

19          Third, you know, one of the messages here --

20  well, before I say the third point, there was (audio

21  interference) misimpression in the record.  There was no

22  third-party cooperation at all from past -- his ex-

23  girlfriend in the case.  I'm not going to (audio

24  interference) with defense counsel.  I'm not (audio

25  interference).  I've been a part of this case since the

14

Proceedings

1   beginning and that was not the situation.

2        And you know, third, I will say that the nature

3   of these threats are just horrific.  I mean, when you

4   think about that he actually showed up to her mother's

5   house after he said some of the things, he says, "The

6   minute you call the cops on me and grow those balls, you

7   watch, I'll blow your husband's head right off in the

8   middle of the street, fucking try me.  Not make me come

9   to your fucking mother's house right now, I'm dead

10  fucking serious.  Don't forget about me.  Remember what I

11  used to do.  I will grab your father right now and beat

12  the dogshit out of him.  Be happy I don't grab you and

13  your fat ugly husband by the neck and drag you down the

14  street."

15       We seriously considered our (audio

16  interference) on detention in this case and believe it is

17  the appropriate course of action (audio interference)

18  meeting (audio interference) at our office and (audio

19  interference) one thing about that.  You know, the

20  defendant was not taking responsibility for his conduct,

21  and practically blaming other people and blaming other

22  people that set him up for this.

23       And the reality is is the blame here falls

24  square on his shoulders.  He is the reason why we are

25  here today and it's nobody else's fault and he should be

15

Proceedings

1   detained until we appear in front of Judge Block.

2          THE COURT:  Hold on just one minute.  I just --

3   Ms. Ennis said that the girlfriend, the ex-girlfriend has

4   changed her mind and doesn't feel threatened by this.

5   What's your response to that?

6          MS. GERDES:  Your Honor, what I will say is

7   that in speaking to her, she has vacillated on how she

8   and her family members have felt and she had -- I feel

9   like I'm in the strangest position conveying, you know,

10  some of the conversations that she has had with the

11  government.  She has said at times that they have felt

12  threatened, she has said at other times that they have

13  not felt threatened.

14         THE COURT:  I'm sorry, I couldn't hear (audio

15  interference) two.  You're breaking up.

16         MS. GERDES:  She has said some things to the

17  government at certain points in time and the government

18  has not, you know, spoken directly to her father.  You

19  know, there's (audio interference) husband feels is very

20  real, you know, that -- this is a situation where the

21  defendant has preyed on people in that neighborhood for

22  years and people say certain things based on our

23  investigation that we did over the course of, you know,

24  five years basically, to try to keep the peace, to --

25  whether it was this defendant, other people involved in

16

Proceedings

1  the case, but I would say that people in that

2  neighborhood and in that community are very afraid of

3  him.  There is no question about that.

4          THE COURT:  All right.

5          MS. GERDES:  He has a serious record (audio

6  interference) that he shot people in broad daylight and

7  in the street in Howard Beach and (audio interference)

8  beating people to a pulp, and so to the extent that she

9  has vacillated for whatever personal reasons or personal

10  things that she may be going through, these are threats

11  that the government takes very, very seriously knowing

12  everything we know about his past and about how he reacts

13  to situations that don't go his way.

14          THE DEFENDANT:  Your Honor, can I say

15  something?  Your Honor, can I say something?

16          MS. ENNIS:  Hey, Gene --

17          THE DEFENDANT:  No, can I just say one thing,

18  Mr. Judge Levy?  I was driving around with the father the

19  other day.

20          MS. ENNIS:  Gene, Gene, I want to recommend

21  that you not say anything on the record.  This is not the

22  appropriate time.

23          THE DEFENDANT:  Okay.  I'm not a threat, your

24  Honor.  I'm not.  I'm not going to hurt nobody.  I didn't

25  nothing but help the government, your Honor.  I put away

17

Proceedings

1  everybody.  I put away crime bosses, everything.  I made

2  one mistake.  I made a mistake.

3          MS. ENNIS:  Gene --

4          THE DEFENDANT:  And I (audio interference) her

5  because we always fight with each other, your Honor.  I

6  don't deserve to be in jail.  I don't deserve this, your

7  Honor.  I know I made a mistake but I don't deserve to be

8  detained.  I made a mistake.  I got to arguing with her.

9  She said something to me, I said something back to her.

10 I shouldn't said that.  I spoke with the mother, the

11 father, everybody.  I was with them.  They were hugging

12 me.  They were going to do my -- the mother was going to

13 take the hair off my back with her laser machine.

14          This is so drawn -- dragged -- thrown out of

15 proportion, your Honor.  It's because I do a podcast and

16 I try to keep kids out of the street and I say something

17 that I'm right and they go crazy on me over it.  I made a

18 mistake, your Honor.  I -- please do not keep me in jail.

19 Please, your Honor.  Please, I'm not going to hurt

20 nobody.

21          THE COURT:  Ms. Gerdes, thank you.  Ms. Gerdes,

22 when were those last threats made?

23          MS. GERDES:  One moment, your Honor.

24          MS. ENNIS:  I believe it was --

25          MS. GERDES:  It was mid-January --

18
                              Proceedings

 1          MS. ENNIS:  -- January 9th.  according to my

 2   records and according to the complaint, it was January

 3   9th.

 4          THE COURT:  And --

 5          MS. ENNIS:  January 9th of this year.

 6          THE DEFENDANT:  I was with the family.

 7          MS. ENNIS:  You mean subsequent to that.  Gene,

 8   I just have to advise you that anything that you say on

 9   the record --

10          THE DEFENDANT:  I'm just saying, I want --

11          MS. ENNIS:  -- can be used against you.

12          THE DEFENDANT:  -- I want the judge to know

13   because she's making me sound like a monster.  I don't

14   know why you're doing this to me, Lindsay.  I did

15   everything for you.  Why you doing this to me?

16          MS. GERDES:  Judge --

17          THE DEFENDANT:  I can't believe you're doing

18   this to me.

19          MS. GERDES:  -- no one is disputing the

20   cooperation effort --

21          THE DEFENDANT:  Then why you doing this to me?

22   What did I do?  I did a podcast?  So what am I doing?  I

23   didn't even do anything.  I made one mistake with my ex-

24   girlfriend.  Why are you burying me like this?  Why are

25   you doing this to me?

19

Proceedings

1           MS. ENNIS:  Hey, Gene?  Gene, I would really
2    recommend --
3           THE DEFENDANT:  No, I did everything for this
4    lady.
5           THE COURT:  All right.  So Ms. -- is Mr.
6    Borrello's probation officer on the line as well?
7           THE PROBATION OFFICER:  Yes, your Honor.
8           THE COURT:  Is Mr. Imrek --
9           THE PROBATION OFFICER:  Good afternoon.  It's
10   Mike Imrek.
11          THE COURT:  Hi.  Tell me a little bit about how
12   you see the situation?
13          THE PROBATION OFFICER:  Judge, we do feel
14   strongly with the government.  We discussed this at
15   length that based on his criminal history, we do think
16   that there is potential for, you know, violence based on
17   his strong criminal history category and his prior, you
18   know, offenses.  We do feel that even if the victim is
19   not, you know, going forward, if she does not go forward
20   later on that we do feel strongly that there is a
21   possibility of him doing violence to her or anyone else
22   that confronts him.
23          In prior meetings that we've had with him, he's
24   also mentioned people on Instagram, you know, that he has
25   verbal arguments with, we hope, we have no evidence that

20

Proceedings

1   it went further than that but he does have back and forth

2   with more than just his ex-girlfriend and her family

3   members.

4           THE COURT:  Well, almost --

5           UNIDENTIFIED SPEAKER:  Excuse me, this is --

6   excuse me, could I speak.  This is Gene Borrello's mom.

7           THE COURT:  Yes.  Go ahead.

8           UNIDENTIFIED SPEAKER:  Hi, your Honor.  I just

9   want to let you know Gene is a very good-hearted person

10  and Ms. Gerdes deep down knows that, okay?  Gene does

11  have bipolar and Gene does have no filter at times and

12  Gene does say things that he doesn't mean.  Gene had a

13  very violent past, yes, he did and he was in a mob-

14  related situation, he was in a gang.  He's no longer in

15  that.

16          Gene is a changed person totally.  He asked

17  Samantha (ph.) -- him and her are always going at it for

18  years.  He asked Samantha if he could put the picture in

19  the book. Samantha went off on him and said -- and Gene

20  said to me (sic), "I wish you would speak to me like a

21  human" and she wouldn't and they argued and that's all it

22  was.  And Gene has no filter and he just blurts it out.

23          Prior to that, he was sitting in the car with

24  the father, the father was complaining about the wife,

25  that she doesn't pay child support, so why -- they're

21

Proceedings

1  friends.  So I don't know where this is all going and I

2  know Lindsay was -- Ms. Gerdes also was very upset about

3  the podcast but Gene is in a second chance program in the

4  podcast and Gene says nothing, if you listen to them, we

5  will send them to you, he does nothing but talk positive

6  and tells the children to stay off the streets, it's not

7  worth it.  In the end, it's dead or jail or cooperation.

8          So I understand they're upset because of the

9  comment but from what I understand, Rob, the husband was

10  coerced to make that statement because Pudgy (ph.), the

11  person that Gene put away is the one that gave the

12  information and made the FBI go to the house and that is

13  also fact.

14          So I'm not here to make my son be an angel but

15  since he's been home, he's no longer in that gang and as

16  far as him being associated with felons, those are

17  cooperators, those are also like Gene, federal informants

18  for the government, that's who he is with.  Those are the

19  people on the podcast.  These are not organized crime

20  because Gene can't be around organized crime because

21  they'll kill him.

22          And as far as Howard Beach, don't stay in

23  Howard Beach.  Gene don't even have any friends.  They

24  don't know -- they just -- it looks like a (audio

25  interference) out there when he's on these super

Proceedings

1  podcasts.  He has one friend, okay?  He's in suicide

2  missions half the time because he's so fucking -- excuse

3  me, he's so depressed.  So they don't know the other

4  side.  I'm sorry, your Honor, that's all I have to say.

5           And Gene could stay with me and I promise you,

6  he will stay in my house and nothing will --

7           UNIDENTIFIED SPEAKER:  Well, he could stay with

8  me, too.  I'm -- I'm his aunt.  He could stay by my house

9  too.  I live in Rockaway Beach and I --

10          UNIDENTIFIED SPEAKER:  We (indiscernible) Gene.

11          UNIDENTIFIED SPEAKER:  -- will put up the bond.

12          UNIDENTIFIED SPEAKER:  You don't know what Gene

13  (indiscernible) how long Gene has come.  I want you to

14  listen to --

15          UNIDENTIFIED SPEAKER:  That's right.

16          UNIDENTIFIED SPEAKER:  -- listen -- one year

17  went by and he thanked everybody and all his fans and --

18  to support him, and you should read all the fans from all

19  around the world, all around the world, that they love

20  him and how one wants to kill himself, and they're like

21  oh, my God, Gene, you saved my life.  Read them all.

22  Tell Lindsay to pull it up -- Ms. Gerdes to pull them up.

23  I'm sorry.

24          MS. GERDES:  Judge is --

25          UNIDENTIFIED SPEAKER:  That's all, your Honor.

23

                              Proceedings
1    That's all I have to say.
2            UNIDENTIFIED SPEAKER:  I'm willing -- he could
3    stay by me, if anything, too.  I live in Rockaway Beach.
4            UNIDENTIFIED SPEAKER:  Yeah, if you don't want
5    him in Howard Beach --
6            UNIDENTIFIED SPEAKER:  I'm his aunt.
7            UNIDENTIFIED SPEAKER:  We are very -- we are a
8    close knit family.
9            UNIDENTIFIED SPEAKER:  Yes.
10           UNIDENTIFIED SPEAKER:  Gene strayed off --
11           UNIDENTIFIED SPEAKER:  I will take him under my
12   wing.  I'll support him and I will do whatever is
13   necessary to make sure he stays on the straight and
14   narrow.
15           UNIDENTIFIED SPEAKER:  Thank you, your Honor.
16   Thank you, Lindsay.  I know that you went after him, I
17   know you (audio interference).
18           MS. GERDES:  Judge, (indiscernible) showed up
19   at the house on January 24th of 2021 and it --
20           UNIDENTIFIED SPEAKER:  This is --
21           MS. GERDES:  I don't know who is speaking right
22   now.  I am trying to speak (audio interference).  The day
23   he showed up at the house, at least our information is
24   January 24th, 2021 and (indiscernible) stated that -- and
25   I just want to add that no one is (audio interference)

24

Proceedings

1   arguing (audio interference).  This is not a --

2           THE COURT:  Ms. Gerdes, you're breaking up

3   (audio interference) --

4           MS. GERDES:  (Audio interference) that the

5   government wanted to be in.

6           THE COURT:  -- hear you.

7           MS. GERDES:  This is not a personal thing.  I

8   have nothing else, your Honor.

9           THE COURT:  All right.  I was having a little

10  trouble hearing what you said.  You broke up a little

11  bit, I think, your mic is -- I don't know what happened

12  there.  What was the last statement that you made?

13          MS. GERDES:  After I gave the dates, I just

14  said this is not a personal thing.  You know, it seems

15  that (audio interference) trying to make it personal.

16  I'm just as disappointed as anyone that we are in front

17  of the Court on allegations as significant as this.

18          THE COURT:  So one of the questions I have,

19  what (audio interference) January 24th and today?  It's

20  taken some time for him to be here.  I'm assuming that

21  whatever danger there was, hasn't -- in your view, hasn't

22  abated since then and yet he has been out.

23          MS. GERDES:  He's --

24          THE COURT:  Why --

25          MS. ENNIS:  Your Honor?  Your Honor?

25

Proceedings

1          THE COURT:  Yes.

2          MS. ENNIS:  Yes, your Honor.  This is Nancy

3    Ennis, one of Gene's attorneys.  I would like to say that

4    since then, we've had a full meeting with the government,

5    with all the FBI agents, with two probation officers, a

6    full and cordial meeting for several hours to discuss in

7    all of these and to make a plan for anger management

8    classes and things like that in the future.  That was

9    February 9th.

10          And the other thing that I know that has

11    happened since then is that his ex-girlfriend called up

12    Gangland News, I think that she likewise likes the

13    attention of all this, she called up Gangland News and

14    Jerry Capeci and in the course of that, she said she is

15    not afraid of him.  That's what I know has happened since

16    then.

17          This is not to cast aspersions on her but to

18    let the Court know they were together for years while he

19    was -- while Gene was in the mob and that the volatile

20    life is one that they shared.

21          THE COURT:  Uh-hum.

22          MS. ENNIS:  (Audio interference) her present

23    husband.  I don't know if the Court -- Gene wanted to

24    stress that her present husband who is the one who is

25    really pushing this matter is a close friend of a person

26

Proceedings

1  that he cooperated against named Pudgy.

2          THE COURT:  Well --

3          MS. GERDES:  Judge, that's based on

4  speculation.  There is no evidence about that whatsoever

5  and I would ask the Court (indiscernible) to anything if

6  the evidence would draw is to the contrary.  You know,

7  (audio interference) speculation, I will say.

8          THE COURT:  All right.  Well, I can't

9  speculate.  All I can do is take whatever is before me

10 and what we have before me, number one, are very

11 threatening statements, dangerous statements made by Mr.

12 Borrello and which indicate a danger and we also have a

13 period of time over a month at which those who are saying

14 that he's so dangerous and who are worried about him

15 remained out and I'm sure there are complicated reasons

16 for that as well.

17          So how am I, who don't have a crystal ball, and

18 who don't know Mr. Borrello, to understand that, those

19 who knew him best felt that he could remain out without

20 these conditions, just with the normal conditions of

21 supervision for over a month before he's -- well, almost

22 a month, while he's here.  When is he -- do we have a

23 date for the hearing, the VOSR hearing?

24          MS. ENNIS:  March 31st, I believe.

25          THE COURT:  So it's almost maybe just a little

27

Proceedings

1  longer than -- it's another (audio interference) longer

2  than (audio interference) before his hearing.  Is there -

3  - what has changed between today and the 24th that makes

4  you believe that he can't remain in the same situation or

5  in a more tightened situation than he was between the

6  24th and today?  What has changed about that?

7          MS. GERDES:  Your Honor, part of the issue --

8  and you're right, there are a lot of complicated reasons

9  why there was a delay between February 9th when we met

10 with the defendant and (audio interference) allegations

11 until now, that we're here.

12          Judge Block actually did sign the arrest

13 warrant last Tuesday.  You know, this was a significant

14 report (audio interference) for the probation department

15 to put it together.  Because of the defendant's

16 cooperation with the government and because of the

17 different aspects of this case and because of, what I

18 will say is the delicacy with which we have had to handle

19 witnesses connected (audio interference) this aspect of

20 the investigation to this whole case, things take time.

21          He has been monitored and been on different

22 levels of, I'll say tighter supervision since that

23 meeting but the real concern here is even when we

24 initially approached him about the threats that he made

25 to his ex, he actually thought that this related to

28

Proceedings

1  threats he had made to somebody else.  And I'll tell you,

2  I'm not convinced that there wasn't a physical

3  altercation between him and another person.  It very well

4  seems like it was.  And there was an incident with him

5  and other people on the street but what this shows us is

6  that as much as he wants to say that he is somebody who

7  is rehabilitated and doing the right thing, that's not

8  what he's doing.

9         You know, behind closed doors and under the

10  backdrop of social media where it's more difficult for

11  law enforcement to always monitor things like private

12  text messages, private audio threats that are sent to

13  people and then disappear, where he's specifically

14  telling people, if you go to police, this is what is

15  going to be done to you.

16         Those aren't the cases that witnesses are

17  always just coming forward and thrilled to cooperate with

18  the government against, especially when it involves

19  people with long histories together.

20         So what I will say though is at this meeting

21  when he was confronted about this activity, we were

22  trying to figure out different options to mitigate the

23  threat to his ex-girlfriend, to her family members, and

24  to the community at large and based on the way the

25  defendant has responded, like I said, he took no

29

Proceedings

1   responsibility for his conduct really whatsoever.  It was

2   more of the blame game.  I can't believe that she came

3   forward.  I can't believe that it was her.  So-and-so is

4   behind this, you know?

5           I really am loathed to kind of air all of that

6   out but the meeting --

7           UNIDENTIFIED SPEAKER:  Excuse me.  Excuse me,

8   Lindsay.

9           MS. GERDES:  -- (audio interference) somebody

10  (audio interference) --

11          UNIDENTIFIED SPEAKER:  Excuse me.  It's his mom

12  again, real fast.  Are you aware that Samantha follows

13  Gene --

14          MS. GERDES:  His mom was not at the meeting.  I

15  don't know why I am being interrupted right now.

16          THE COURT:  Yes, please, I'm sorry, ma'am.

17          UNIDENTIFIED SPEAKER:  Oh, I'm sorry.  Okay.  I

18  will speak after her.  Okay.

19          MS. GERDES:  Okay.  So -- and again, I don't

20  want to say anything that is going to put any other

21  witness right now more so in harm's way, put more of a

22  target on their back.  Like I said, this is a delicate

23  situation where it's not just, you know, him making

24  threats against his ex, it's against her family members,

25  people who mean something to her, people who he doesn't

30

Proceedings

1   have the same history with, people who are without

2   question affected by getting a death threat from somebody

3   like him who shot people in the past.

4        And given that he did all of this from home,

5   given that, you know, he's been really -- was

6   disrespectful during the entire meeting and not

7   responding in a way that gave anyone in the room any kind

8   of comfort that there wasn't potentially going to be

9   further escalation of this, whether it was with her or

10  with people he could have set this up or with other

11  people or just people generally in the community because

12  even based on his own admissions, he has had other issues

13  with other people and, you know, unfortunately he is not

14  somebody who can control his anger and his rage.

15       And you know, he may think that he's not going

16  to do something to her but that doesn't mean he's not

17  going to take his aggression and frustration in a

18  physical way out on somebody else which is something he's

19  done before.

20       And like I said, your Honor, we wouldn't be

21  here making this argument unless (audio interference)

22  outcome, knowing everything that we know about him and

23  about the case.

24            MS. ENNIS:  Your Honor, may I be heard?

25            THE COURT:  Yes.

31

Proceedings

1            MS. ENNIS:  Yeah, this is Nancy Ennis again.  I

2   was at that meeting.  It took several hours.  At first

3   when they broached that subject, he did react and he was

4   taken by surprise and his initial reaction was to be

5   dismissive of his girlfriend's credibility, let's just

6   put it that way and to think that she had blown things

7   out of proportion, so forth and so on.

8            That said, as the meeting progressed, it is not

9   fair to say that he did not take responsibility.  He

10  specifically did and I hesitate to say that because I'm

11  his attorney and I don't want to in essence "confess" on

12  his behalf but this has been raised, he did take

13  responsibility and he said he felt that their reaction to

14  what had happened was overblown and tried to explain it

15  in the context of his relationship with his ex-girlfriend

16  and that he clearly had resolved it since that time and

17  was in good contact with her and her family but he did

18  take responsibility.  That's just simply the case.  I was

19  there.

20           THE DEFENDANT:  I speak to the mother everyday,

21  your Honor.  I am always on the phone with the family.  I

22  still talk to them, your Honor.  I'm friends with them,

23  your Honor.  That's what I am trying to say, this is so -

24  - I understand I made a mistake, I did.  I own up to

25  that.  But I would never hurt them.  I've never hurt

32

Proceedings

1  nobody, I haven't been in no altercation.  I sit in the

2  house.  I don't have nobody to hang out with.  I call

3  Instagram, and I talk a little bit.  I don't do anything

4  wrong, your Honor.  I don't know why -- I don't

5  understand what's going on right now.  I'm so confused.

6              UNIDENTIFIED SPEAKER:  Gene, explain to --

7  Gene, explain to him that Samantha follows your story

8  please and we have --

9              THE DEFENDANT:  She goes on my Instagram.

10             UNIDENTIFIED SPEAKER:  -- (audio interference)

11  follow you.

12             THE DEFENDANT:  She goes on my stuff.  This is

13  so ridiculous, your Honor.  This is like -- this is so

14  blown out of proportion.

15             UNIDENTIFIED SPEAKER:  She follows him.

16             THE DEFENDANT:  I -- I don't understand what I

17  did wrong -- like I understand I made the threat, I made

18  the mistake but I didn't mean that.  I would never hurt

19  them.  I spoke them.  I spoke to the family.  I'm with

20  the father.  I drove around in my car, we're talking.

21  They know I would never hurt them.

22             UNIDENTIFIED SPEAKER:  Don't forget --

23             THE DEFENDANT:  I wouldn't hurt nobody no more.

24             UNIDENTIFIED SPEAKER:  He's not that person no

25  more.  He may be his mouth, yes.

33

Proceedings

1        THE DEFENDANT:  He could make me go back to

2   jail for this.

3        UNIDENTIFIED SPEAKER:  He's not -- has he --

4   has he hurt anybody since he's been in one year?  No.

5        MS. ENNIS:  Yeah, I would mention that the acts

6   of violence that the government keeps discussing end key

7   date, the year 2014 when I started to represent him, that

8   I have represented him since late 2014 and so I know that

9   he was incarcerated and did not have any incidents that

10  I'm aware of during that time as his attorney.

11        THE COURT:  All right.  Well, thank you

12  everyone.  This is by no means an easy case.

13        UNIDENTIFIED SPEAKER:  Thank you.

14        THE COURT:  And I think this unfortunately is

15  going to be decided by the burden of proof which is how

16  judges are instructed that they have to act.  For

17  example, if I thought that it was just as likely that Mr.

18  Borrello would not harm Samantha, I believe is her name,

19  and her family --

20        UNIDENTIFIED SPEAKER:  Yes.

21        THE COURT:  If I thought that it was just

22  likely, or even more likely than not that he would not

23  harm them, that would not be enough because what I would

24  need to have is clear and convincing evidence that there

25  would be no harm and the problem is that when someone is

34

Proceedings

1    on probation or supervised release and under court

2    orders, to make threats of violence that are that

3    serious, that's -- courts have to take that seriously and

4    there's a very heavy burden on a defendant who has made

5    those statements.

6          Now I may be convinced that it's more likely

7    than not that you won't hurt anyone but that's not

8    enough, the law instructs me that the evidence has to be

9    clear and it has to be convincing and after statements

10   like that have been made while someone is under court

11   orders, the question then is well, will you move from

12   words to action and if the statement had been made once

13   or twice, I think they would carry less weight but the

14   problem is it's a heavy burden for you to overcome.

15         But what has troubled me and what I was trying

16   to probe was the period of time between the 24th and

17   today essentially where apparently nothing has happened,

18   there have been no other threats, there's been no

19   violence and the government was not -- I understand the

20   argument that it takes time to bring things together but

21   if the danger was that serious, you know, the government,

22   I assume, would've moved very quickly if it thought that

23   it was imminent.

24         So what I am guessing is that the government's

25   position is that the danger is serious but that it wasn't

35

Proceedings

1   as imminent and it could happen at any time because of

2   volatility.

3           So my ruling as I've outlined a little earlier

4   is based on the burden of proof and the burden of proof

5   is clear and convincing evidence and it's on (audio

6   interference) to prove by clear and convincing evidence

7   that he's not a danger and because those words that came

8   out of your mouth, Mr. Borrello, were so serious, even if

9   you don't mean them now, it's hard for me to see clear

10  and convincing evidence that you would be able to

11  restrain yourself in the future.

12          So as I said, it's a very close case, it's very

13  tight.  Judge Block will be the one who will ultimately

14  decide what your future will be but for the bail hearing,

15  I'm going to deny the bond (audio interference) because I

16  don't think you can meet the high burden of (audio

17  interference) convincing evidence that there's no danger.

18          THE DEFENDANT:  Why would you do this to me,

19  Lindsay?  Why would you do this to me, Lindsay?  What did

20  I do to you?  I did nothing wrong to you?  Why would you

21  do this to me?

22          UNIDENTIFIED SPEAKER:  She retracted it, your

23  Honor.  She retracted her statement that they're (audio

24  interference).

25          THE DEFENDANT:  (Indiscernible).

36

Proceedings

1          UNIDENTIFIED SPEAKER:  Hello?

2          UNIDENTIFIED SPEAKER:  I'm getting a better

3  lawyer, this is so sad.  This is sad.

4          THE DEFENDANT:  (Indiscernible).

5          UNIDENTIFIED SPEAKER:  I (audio interference)

6  everything for this judge.

7          THE DEFENDANT:  Why would you do this to me?

8          UNIDENTIFIED SPEAKER:  Your Honor, just (audio

9  interference) out.  This is --

10         THE DEFENDANT:  This (audio interference).

11         UNIDENTIFIED SPEAKER:  This is so sad.

12         THE COURT:  I don't think anyone --

13         UNIDENTIFIED SPEAKER:  So now he goes in --

14         THE COURT:  -- (audio interference).

15         UNIDENTIFIED SPEAKER:  Wait.  So now he's going

16  to go in and get COVID.

17         THE DEFENDANT:  This is it.  This is it.

18         UNIDENTIFIED SPEAKER:  Hello?

19         UNIDENTIFIED SPEAKER:  Twenty-three-hour lockup

20  in a hole now my son's going to go now.

21         THE DEFENDANT:  I wouldn't hurt nobody, your

22  Honor.

23         UNIDENTIFIED SPEAKER:  And do you know what?

24  He's probably going to get his throat slit in there from

25  twenty-one informants that he helped the government put

Transcriptions Plus II, Inc.

37

Proceedings

1   away.  Very nice.

2          UNIDENTIFIED SPEAKER:  Oh, my God.

3          THE COURT:  Is there a danger?  Has anyone --

4          UNIDENTIFIED SPEAKER:  That's so sad.

5          UNIDENTIFIED SPEAKER:  There's no reason for

6   this.

7          THE COURT:  Is he --

8          UNIDENTIFIED SPEAKER:  There's no reason for

9   this.

10          UNIDENTIFIED SPEAKER:  So sad.

11          UNIDENTIFIED SPEAKER:  I would take him home.

12   I would take full responsibility.

13          MS. GERDES:  Judge, (audio interference).

14          THE COURT:  Excuse me.  Could everyone please,

15   I need some silence.

16          MS. GERDES:  Lindsay, please.  Lindsay --

17          THE CLERK:  Excuse me.  Stop talk -- we are

18   recording the proceeding, so stop yelling.  We don't know

19   who is talking.  But Lindsay, this is Sui-May, we're

20   having a hard time hearing you on and off.  Maybe just

21   stay at a certain area.

22          MS. GERDES:  Okay.  Can you hear me now?

23          UNIDENTIFIED SPEAKER:  This is not right.

24          THE CLERK:  This is good.  Stay where you are.

25   Okay.  Go ahead.

Proceedings

38

1      UNIDENTIFIED SPEAKER:  No, I said Lindsay,

2  please.

3      THE COURT:  Is there a danger for him at the

4  MDC?

5      MS. GERDES:  There is no specific person right

6  now at the MDC that the defendant cooperated against that

7  I am aware of.  This (audio interference) at the MDC and

8  we are going to make sure that he's not in a position

9  (audio interference).

10      THE COURT:  How are we going to make sure?

11      UNIDENTIFIED SPEAKER:  Take away his phone?

12      MS. GERDES:  Since all of this is (audio

13  interference) I would rather now put all of that on the

14  record but I am going to be in contact with the legal

15  staff at the MDC and with the BOP to address the

16  situation, as part of the conversation that I started

17  before today (audio interference) is a very likely

18  outcome.

19      THE COURT:  Are there any members of the

20  Bonanno organization at the MDC at this time?

21      UNIDENTIFIED SPEAKER:  Yes.

22      THE COURT:  If you know?

23      MS. GERDES:  I don't know the answer to that.

24  No one that the defendant cooperated against is at the

25  MDC (audio interference).

39

Proceedings

1          THE COURT:  All right.  But it's a large

2    organization and there is some loyalty in that

3    organization.

4          MS. GERDES:  Understood, your Honor and we've

5    already taken (audio interference) steps underway to

6    (audio interference) not have the defendant at the MDC

7    but like I said, since we're on tape today, I prefer not

8    to discuss that on the record.

9          THE COURT:  Okay.

10         THE DEFENDANT:  So not going to happen (audio

11   interference).

12         THE COURT:  All right.  So what I will --

13         UNIDENTIFIED SPEAKER:  Your Honor?

14         THE COURT:  Excuse me.  What I would like from

15   the government is just you can send it ex parte to

16   chambers with a copy to Mr. Borrello's counsel.  I would

17   like to know if there are any members of the Bonanno

18   organization at the MDC and what efforts will be made to

19   make sure that he's safe.

20         MS. GERDES:  Yes, your Honor.

21         THE COURT:  So do we know if there's -- is

22   there a way to accelerate the hearing before Judge Block?

23         MS. GERDES:  I can reach out to his deputy and

24   ask that that happen.  We have March 31st as the date but

25   I will reach out to Mike Inelli and ask for an earlier

40

Proceedings

1    date.

2              THE COURT:  Okay.  So if you can get me that --

3              UNIDENTIFIED SPEAKER:  Excuse me.  Can I please

4    say --

5              THE COURT:  -- by the end of the day or

6    tomorrow morning at 10.

7              THE DEFENDANT:  Ma, don't worry no more.

8              UNIDENTIFIED SPEAKER:  Your Honor? Your Honor?

9              MS. GERDES:  Yes, your Honor.

10             THE COURT:  Thank you.

11             UNIDENTIFIED SPEAKER:  Your Honor?

12             THE COURT:  Yes.

13             UNIDENTIFIED SPEAKER:  Your Honor, isn't there

14   a pandemic right now?  Didn't they release thousands and

15   thousands disgusting inmates?

16             THE COURT:  All right.

17             UNIDENTIFIED SPEAKER:  You're putting someone

18   in that helped the government, twenty-one informed -- he

19   put away twenty-one people for them, the biggest case,

20   Vinny Asaro.

21             THE DEFENDANT:  They don't care.

22             UNIDENTIFIED SPEAKER:  They got killed with

23   that.  You don't remember all this?  My son stood up for

24   them and took their back and I understand he made that

25   statement but he is friends with them.  Samantha said it,

41

Proceedings

1   it's a petty situation.  I sent the article to Ms. Ennis.

2   She said petty.  She wrote -- she put the word petty in

3   there.  They're all friends.  She knows Rob.  It's over

4   with.  It's been over with.  Please, your Honor, I will

5   take responsibility.  He could stay in my house or my

6   sister's.  He will not go out --

7           UNIDENTIFIED SPEAKER:  Yes.

8           UNIDENTIFIED SPEAKER:  -- he'll have an ankle

9   bracelet.  I don't want him to get COVID.  He has

10  bronchial -- he has acute bronchial.  If he -- when he

11  gets cold, it goes right into his chest.  Like I don't

12  want -- they're releasing people right now.  Why is he

13  going in?  He's doing nothing but the right thing.

14          Yes, he did speak a little bit.  He does have a

15  mouth but he is bipolar and he does say certain things

16  sometimes but he didn't hurt nobody and he's not going to

17  hurt nobody.  He has a girlfriend, a nice girlfriend,

18  Joanna (ph.).  She texts me all of the time from Staten

19  Island.  It's over with.  There's nothing going on.  I

20  don't understand why they're doing this.

21          I understand why they're doing this, I

22  shouldn't say I don't understand, I do understand because

23  he made a --

24          UNIDENTIFIED SPEAKER:  Because of husband.

25          UNIDENTIFIED SPEAKER:  -- violent threat, yes

42

Proceedings

1  but please, your Honor, please reconsider this, just

2  until Judge Block -- if Judge Block puts him away for ten

3  years, so be it but now please, just let him come here

4  and, you know, learn his lesson.

5              UNIDENTIFIED SPEAKER:  Yup.  Take his phone

6  away from him, put him on the ankle bracelet --

7              UNIDENTIFIED SPEAKER:  Yeah.

8              UNIDENTIFIED SPEAKER:  -- and that's it.

9              UNIDENTIFIED SPEAKER:  Believe me, yeah.

10             UNIDENTIFIED SPEAKER:  He has no more social

11 media, no -- well, he won't do --

12             UNIDENTIFIED SPEAKER:  Nothing, he won't do

13 nothing.

14             UNIDENTIFIED SPEAKER:  -- he won't anything.

15             UNIDENTIFIED SPEAKER:  He won't do the show no

16 more.

17             UNIDENTIFIED SPEAKER:  He won't do the show

18 anymore.

19             UNIDENTIFIED SPEAKER:  Nothing.

20             UNIDENTIFIED SPEAKER:  He won't (audio

21 interference).

22             UNIDENTIFIED SPEAKER:  Yeah, and that's a

23 (audio interference).

24             MS. GERDES:  Judge, I'm going to ask the Court

25 to (audio interference) upon its ruling.

43

Proceedings

1           UNIDENTIFIED SPEAKER:  Yes, it will end

2    everything.

3           MS. GERDES:  I think the (audio interference)

4    needs to be concluded at this point.

5           THE COURT:  Thank you.

6           THE CLERK:  Yes.

7           THE COURT:  All right.  Thank you.  Thank you.

8           THE CLERK:  Thank you.

9           THE COURT:  I know that you all had an

10   opportunity to speak.  Thank you.

11          MS. GERDES:  Thank you, your Honor.

12          UNIDENTIFIED SPEAKER:  Thank you.  Thank you.

13          THE CLERK:  Thank you.

14          MS. ENNIS:  Thank you.

15          THE CLERK:  Okay.  Have a good one, everyone.

16          THE DEFENDANT:  Now what?  What do I do?

17          UNIDENTIFIED SPEAKER:  I don't know.

18                     (Matter Concluded)

19                          -o0o-

20

21

22

23

24

25

44

# C E R T I F I C A T E

I, LINDA FERRARA, hereby certify that the foregoing transcript of the said proceedings is a true and accurate transcript from the electronic sound-recording of the proceedings reduced to typewriting in the above-entitled matter.

I FURTHER CERTIFY that I am not a relative or employee or attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, or financially interested directly or indirectly in this action.

IN WITNESS WHEREOF, I hereunto set my hand this **26th** day of **February** 2021.

*Linda Ferrara*
Linda Ferrara

AAERT CET 656
Transcriptions Plus II, Inc.